# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | : <br> : <br> : <br> :   CIVIL ACTION NO. 2:21-cv-4294 <br> : |
|           Plaintiff, | : <br> : |
|    v. | : <br> : |
| GEISINGER HEALTH, GEISINGER HEALTH SYSTEM FOUNDATION d/b/a GEISINGER HEALTH SYSTEM, GEISINGER WYOMING VALLEY MEDICAL CENTER, GEISINGER CLINIC, GEISINGER HEALTH PLAN, GEISINGER MEDICAL CENTER, and GEISINGER HOLY SPIRIT HOSPITAL, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
|           Defendants. | : <br> : <br> : |

## <u>BRIEF OF DEFENDANTS IN SUPPORT OF</u>
## <u>LIMITED AND/OR BIFURCATED DISCOVERY</u>

BUCHANAN INGERSOLL & ROONEY PC
Anthony (T.J.) Andrisano (PA 201231)
Jacob Sulzer (PA 313089)
409 N. Second Street, Suite 500
Harrisburg, PA 17101
anthony.andrisano@bipc.com
jacob.sulzer@bipc.com

Melissa Murphy Weber (PA 76959)
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
melissa.weber@bipc.com

*Counsel for Defendants*

Dated: December 30, 2021

# **TABLE OF CONTENTS**

I.    Introduction ................................................................................................................ 1

II.    Recommendation on Limited Discovery/Bifurcated Action ................................. 6

III.    Relevant History Supporting Limited Discovery/Bifurcated Action................................. 7

IV.    Argument Supporting Recommendation on Limited Discovery/Bifurcated Action .......... 9

   A.    The Claim will be disposed of through Motion ........................................................... 11

   B.    Cost cannot be ignored.................................................................................................. 13

   C.    Rules and precedent permit and encourage limited discovery and/or bifurcation ........ 14

V.    Conclusion ................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*EEOC v. Lawler Foods, Inc.*, 128 F.Supp.3d 972 (S.D. Tx. 2015) ............................................... 15

*EEOC v. Mavis Discount Tire*, 129 F.Supp.3d 90 (S.D.N.Y. 2015) ............................................. 15

*EEOC v. PMT Corp.*, 124 F.Supp.3d 904(D. MN. 2015)....................................................... 14, 15

*EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001)..................................................................... 2

*EEOC v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333 (11th Cir., 2016) ............................... 3, 7, 13

*Elledge v. Lowe's Home Centers*, 979 F.3d 1004 (4th Cir. 2020)........................................... 3, 11

*Equal Emp't Opportunity Comm'n v. JBS USA, LLC*, Civ. Action No. 10–cv–02103–PAB–
    KLM, 2011 WL 3471080 (D.Colo. Aug. 8, 2011) .................................................................... 15

*Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944  (8th Cir. 1999) ............................................ 12

*Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480 (8th Cir. 2007)....................................................... 12

*Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324 (1977).............................................. 14, 15

*Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911 (8th Cir. 2013) ......................................... 12

*Lincoln v. BNSF Railway Co.*, 900 F.3d 1166 (10th Cir., 2018) .................................................... 3

*U.S. Airways v. Barnett*, 535 U.S. 391 (2002) ................................................................................. 2

**Rules**

Fed. R. Civ. P. 26(a)(1) ................................................................................................................... 14

Fed. R. Civ. P. 42 ............................................................................................................................ 14

*Unpublished cases attached as Exhibit C.*

**BRIEF OF DEFENDANTS IN SUPPORT OF**
**LIMITED AND/OR BIFURCATED DISCOVERY**

Defendants Geisinger Health, *et al.*, (collectively "Defendants" or "Geisinger") hereby submit a Brief in Support of Limited and/or Bifurcated Discovery in this matter in accordance with this Honorable Court's Order, issued following the preliminary pretrial conference held on November 30, 2021. (Doc. 8). Defendants submit that the method of discovery proposed by Plaintiff, Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") – and the discovery served to date – is unnecessarily burdensome and that the Parties must take the common sense approach of focusing on whether liability exists prior to assessing whether any of Defendants' employees were actually impacted by the allegedly improper policies or practices. In the alternative, Defendants should be given the opportunity to file their anticipated Rule 12 Motion, addressing and potentially disposing of the majority, if not all, of the legal issues involved in this matter – prior to incurring the significant and potentially unnecessary expense of discovery, and, even more importantly, prior to Defendants being forced to divert internal resources from providing necessary healthcare services to the public during the COVID-19 pandemic.

## I.  Introduction

The EEOC insists – contrary to prevailing legal precedent – that the Americans with Disabilities Act ("ADA") is akin to an affirmative action statute, mandating noncompetitive reassignment of disabled employees. Meaning, the EEOC believes, under the ADA, if an employee is disabled and may require an accommodation in the form of a different job, the employer must **automatically** place the disabled employee into any available vacant position, regardless of the type of position (*i.e.*, one providing direct care to a patient) and/or whether there are more qualified individuals vying for the same position.

1

For at least twenty-years, the EEOC, through enforcement actions or as an *Amicus Curiae*, has asked federal courts across the country to accept its interpretation of the ADA; that is, to require the automatic, unquestioned, noncompetitive reassignment of disabled individuals to any open position, without regard for the overall qualifications of the disabled individuals, the type of business engaged in by the employer (*i.e.*, healthcare), and/or whether there are more senior or more qualified applicants. Initially, the EEOC focused on seniority policies – asking courts to disregard employer seniority policies. *See EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001) (affirming summary judgment and rejecting the EEOC's argument that employer must disregard its seniority policy and automatically transfer employee into a position over a more senior employee). This argument was ultimately rejected by the Supreme Court of the United States in *U.S. Airways v. Barnett*, 535 U.S. 391 (2002), which held the ADA does not require reassignment that would violate a seniority system.

After the Supreme Court's holding in *Barnett*, the EEOC switched its focus to employers implementing "most qualified applicant" policies – *i.e.*, policies wherein employers make hiring/reassignment decisions based on the most qualified applicant for the position. Indeed, similar to the arguments advanced with respect to seniority systems, the EEOC adopted the position that the ADA is an affirmative action statute requiring employers to completely ignore their most qualified applicant policies by reassigning disabled individuals to <u>any</u> open position without consideration of the individuals' overall qualifications for the position and even if a more qualified applicant applied for the same position. For example, according to the EEOC, a hospital must reassign an employee returning from a one (1) year non-FMLA medical leave with only a few months of experience as an ophthalmology nurse to an open emergency room nursing position

instead of a nursing applicant with fifteen or twenty years of experience working as an emergency room nurse.

For obvious reasons, appellate courts across the country have repeatedly rejected the EEOC's position. *See, e.g., Elledge v. Lowe's Home Centers*, 979 F.3d 1004, 1015 (4th Cir. 2020) (upholding an employer's most qualified applicant policy and declaring the ADA requires the disabled employee be given the **same** opportunities, not preferential reassignment over others – despite the EEOC Amicus Brief arguing automatic reassignment is required and that there is no exception for competitive hiring policies); *see Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1205 (10th Cir., 2018)[1] (disagreeing with EEOC Amicus Brief for reassignment without competition and ruling "the requirement to reassign a disabled employee to a vacant position for which he is qualified is not absolute. Reassignment may not be reasonable where it conflicts with an 'important employment policy'"); *see also, EEOC v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1345 (11th Cir., 2016) ("[t]he EEOC appeals, arguing that the ADA mandates noncompetitive reassignment … [w]e agree that the ADA does **not** require reassignment without competition for, or preferential treatment of, the disabled." **"In the case of hospitals, which is this case, the well-being and even the lives of patients can depend on having the best-qualified personnel. Undermining a hospital's best-qualified hiring or transfer policy imposes substantial costs on the hospital and potentially on patients."**) (*emphasis added*).

Notwithstanding these clear and consistent holdings aligning with the Supreme Court's decision in *Barnett*, as well as the legislative history and plain text/purpose of the ADA,[2] the EEOC

---

[1] Notably, within the Rule 26(f) Report, the EEOC selectively cites to *Lincoln v. BNSF Railway Co.*, failing to acknowledge that the 10th Circuit agreed that reassignment to a vacant position may not be reasonable where it conflicts with another important policy.

[2] Attached hereto as Exhibit A is a copy of the Motion for Reconsideration Letter Brief filed with the EEOC which extensively details the overwhelming legal support forming the basis for these

now seeks to ignore these earlier well-reasoned decisions and take its chances on the same issue in the Third Circuit. Indeed, a mere three (3) months after the *Elledge* Court found against the EEOC's position with respect to this issue, the EEOC issued the initial Letter of Determination in this matter.

Similar to the cases cited above, the EEOC takes issue with Defendants' most qualified applicant policy,[3] specifically as it applies to Defendants' "Other Leaves of Absence" Policy ("Policy 04.231"), which provides employees with a greater benefit than required by law; *see also*, Motion for Reconsideration Letter Brief, attached hereto as Exhibit A, for an extensive discussion of Policy 04.231.

In short, Policy 04.231 provides employees who are ineligible for FMLA leave – either because such leave has been exhausted or because they do not meet the eligibility requirements under the statute – with the ability to take "Non-FMLA Medical Leaves of Absence". Specifically, Policy 04.231 provides that, when an employee requires medical leave and is ineligible for FMLA leave, Defendants will engage in an interactive process with the employee in accordance with the ADA. If it is determined, after the interactive process, that the employee cannot be provided with

---

appellate courts to continually uphold the rights of employers to implement their most qualified applicant policies.

[3] Specifically, the EEOC alleges that Defendants improperly maintained "most qualified" policies that required ADA-covered employees to apply and compete for reassignment. (Doc. 1, ¶ 20 (d)&(e)). The EEOC further alleges that Defendants refused to reassign Rosemary Casterline because she was not the most qualified applicant. (Doc. 1, ¶ 20 (s)). Moreover, the first paragraph of the EEOC's prayer for relief asks for an injunction to permanently enjoin Defendants from following its best qualified applicant policy. (Doc. 1, Prayer for Relief, ¶A). The EEOC also explicitly states, in the Rule 26(f) Report, that "**Defendants' discriminatory practices are rooted, inter alia, in discriminatory policies of Geisinger Health….**" The EEOC further claims Defendants' policies "**impermissibly require employees with disabilities … to compete for positions for which they are qualified to obtain the reasonable accommodation of reassignment (a so-called "best qualified applicant" policy)**…and require termination of employment for those employees in need of reassignment who are not selected as the most-qualified candidate for a vacant position." (emphasis added).

job-protected leave, rather than potentially terminate the employee for requesting an unreasonable or unduly burdensome amount of leave, Policy 4.231 provides the basis for the employee to be placed on medical leave for up to one year. When the employee is able to return to work, the employee is given up to two (2) months to work with Defendants to identify an open position without losing seniority and/or certain benefits. The employee also remains an "internal" candidate, which provides the employee with preferential treatment over external candidates with the same qualifications. During this entire process, Defendants not only engage in an interactive process with the employee, but they remain in constant communication with the employee.

The EEOC takes the position that the ADA requires an employee returning from this leave to be **<u>automatically</u>** placed in any open position for which the employee meets the minimum basic qualifications, even though the employee has not performed any job responsibilities for up to one (1) year and there may be other more qualified applicants. This position initially ignores the interactive process engaged in with the employee and which, if the parties had not reached such a reasonable accommodation, could have resulted in the termination of the employee. Again, Policy 04.231 provides the basis for employees to receive greater benefits than what is required by law. Even more troubling, however, is the EEOC's position that the ADA is an affirmative action statute and, as a result, Defendants – healthcare entities responsible for the well-being and even the lives of patients – are not permitted to hire the most qualified candidate to provide patient care. Instead, they must ignore those most qualified to provide patient care in favor of less qualified applicants.

Respectfully, such a result is not only illogical, but it directly contradicts the ADA's text, purpose, and legislative history as well as the Supreme Court's *Barnett* decision and its progeny. *See also*, Motion for Reconsideration Letter Brief, attached hereto as Exhibit A. Accordingly, especially given the foregoing, Defendants submit that discovery must first focus on liability – on

the policies at issue. If the Honorable Court believes these policies run afoul of the ADA – contrary to the aforementioned appellate courts – only then should the Parties engage in the discovery necessary to determine which employees were potentially impacted by the policies. The EEOC's current discovery strategy, including pending written discovery requests seeking information about which employees were subject to the policies is, in colloquial terms, "putting the cart before the horse" and would only serve to cause the Parties, in particular, Defendants, to incur hundreds of thousands of dollars in potentially unnecessary discovery costs.

## II.    Recommendation on Limited Discovery/Bifurcated Action

Defendants maintain that discovery should be completed in a bifurcated manner. First, in Phase One, the Parties can complete discovery on the allegedly discriminatory policies – Defendants' Policy 04.231 and their most qualified applicant policies. Concurrent with Phase One of discovery, Defendants intend to file a Rule 12 Motion and close the pleadings. The Rule 12 Motion will be aimed at cleaning up certain procedural and substantive matters[4] to ensure the Parties and this Honorable Court are focused on the same cognizable claims moving forward. Defendants do not anticipate their Rule 12 Motion will delay Phase One of discovery.

At the conclusion of Phase One, the Parties can move for summary judgment with respect to liability – allowing this Honorable Court to decide whether Defendants' policies truly violate the ADA, as the EEOC alleges. If, at that point, this Honorable Court agrees with the EEOC, then the Parties can conduct Phase Two of discovery, which will focus on an evaluation of the individuals who were purportedly impacted by Defendants' policies. At the close of Phase Two,

---

[4] As disclosed by both the EEOC and Defendants in the Joint Rule 26 report, Defendants informally raised concerns including but not limited to the temporal scope of the Complaint, whether the EEOC properly followed administrative prerequisites, and the naming of Geisinger entities that had not been identified during the course of the underlying agency action.

as necessary, the Parties can move this Honorable Court to address the proposed "class" of aggrieved individuals and remedies.

As an alternative, Defendants respectfully request that they be given the opportunity to file their anticipated Rule 12 Motion, addressing and potentially disposing of certain legal issues involved in this matter – including potentially limiting the temporal scope of the Complaint as well as the Geisinger entities involved in this matter – prior to incurring the significant and potentially unnecessary expense of discovery.

## III.    Relevant History Supporting Limited Discovery/Bifurcated Action

Although the pleadings in this matter have not closed, the pertinent history from the underlying EEOC investigation which triggered the instant enforcement action should be considered.  It is especially relevant because it illustrates the need for and reasonableness of Defendants' request for bifurcated discovery.  Again, the EEOC's investigation centered around its unwavering – yet, unsupported – position that the ADA requires reassignment without competition while Defendants, following the Supreme Court's *Barnett* decision and its progeny, maintain that, as healthcare entities, they must follow their most qualified applicant policies and hire the most qualified applicant for any and all open positions.  Defendants believe this to be especially true in their case since, as healthcare entities, the well-being – and often the very lives of patients – depend on having the most qualified personnel.  *See EEOC v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333 (11th Cir., 2016) ("Undermining a hospital's best-qualified hiring or transfer policy imposes substantial costs on the hospital and potentially on patients.")

The EEOC's investigation in this matter did not focus on whether the employee, Rosemary Casterline, was the most qualified for any of the positions that were open when she was medically cleared to return to work.  In fact, the EEOC's investigation did not include any request for

information or documentation relating to these open positions **prior to** the EEOC rendering its Letters of Determination in this matter.

Moreover, the EEOC's initial Letter of Determination primarily concentrated on the policy requiring those returning from non-FMLA or job protected leave to compete for any open positions, stating, in relevant part:

> The totality of the evidence supports the conclusion that [Geisinger] has a **policy or practice of requiring disabled employees to compete for vacancies for reassignment**.

The EEOC's Amended Letter of Determination was also focused on the same issue, stating, in relevant part:

> The totality of the evidence supports the conclusion that [Geisinger] maintained, and continues to maintain a policy or practice that violates the ADA in that [Geisinger] fails to provide reasonable accommodations, such as reassignment or other employment opportunities, **and that [Geisinger] unlawfully requires disabled persons to compete for reassignments or such opportunities**.
>
> …
>
> [Geisinger] has subjected a class of aggrieved persons who are protected from discrimination by the ADA to ongoing pattern or practice of discrimination in violation of the Act by failing to engage in the interactive process sufficiently to provide reassignment or other employment opportunities;
>
> …

To that end, Defendants' suggested course of discovery actually mirrors the action taken by the EEOC during its investigation into this matter – concentrating on whether Defendants' policies actually violate the ADA, not whether Ms. Casterline was, in fact, the most qualified for any of the positions that were open when she was medically cleared to return to work. It is only logical for the Parties to follow the same process in this matter – *i.e.*, focus on whether Defendants' policies actually violate the ADA and, then, only if necessary, take discovery regarding which employees were potentially impacted by such policies.

## IV.     Argument Supporting Recommendation on Limited Discovery/Bifurcated Action

Defendants' request for limited discovery/bifurcated action arises from the EEOC's apparent decision to change course from an initial focus on whether Defendants' policies themselves actually violate the ADA to insisting on immediate discovery regarding the **<u>application</u>** of the policies (*i.e.*, every single document related to every single employee of Defendants' combined 24,000 employees who requested leave over a period of almost four (4) years and/or reassignment requests, as well as how Defendants handled each request). Specifically, the EEOC proposed the following scope of discovery within its portion of the Rule 26(f) report:

> Discovery will include but not be limited to Geisinger's policies and practices, training materials, information related to Geisinger's discriminatory treatment of Casterline and a class or additional aggrieved persons, **records relating to Geisinger's application of its discriminatory policies and practices**, and information regarding Defendant's corporate structure.

(emphasis added).

Additionally, during the preliminary pretrial conference held on November 30, 2021, counsel for the EEOC indicated that the EEOC's discovery proposal includes the Agency initially evaluating the specific application of the policies the EEOC believes to be improper, including an evaluation of each and every interaction between the Defendants and every single one of their employees who sought leave or an accommodation under the subject policies for a period of almost four (4) years. The EEOC also served initial discovery requests which are even broader – seeking information/documentation for a period of almost four (4) years relating to the application of the policies the EEOC believes to be improper **<u>as well as</u>** other leave policies of Defendants that were never part of the EEOC's investigation. As one example, the EEOC's first Request for Production of Documents asks Defendants to produce "documents for each employee who has taken,

requested, sought, or inquired about (including where others requested, sought, or inquired about the following on his or her behalf) **<u>FMLA leave</u>** for his or her own serious health condition…at any time during the period of January 1, 2018 through the present". *See*, excerpt from Document Request No. 1, attached hereto as Exhibit B (emphasis added).

This shift is extremely troubling to Defendants for a myriad of reasons. First, as noted above, the EEOC's investigation did not focus on whether Ms. Casterline was the most qualified for the positions that were open when she was medically cleared to return to work. In fact, the EEOC's investigation did not include a single request for information or documentation relating to these open positions **<u>prior to</u>** the EEOC rendering its Letters of Determination in this matter. Again, the EEOC's focus was on the **<u>existence</u>** of such policies – that Defendants, pursuant to their most qualified applicant policies, did not automatically place employees returning from non-FMLA medical leave in any open position; they, as healthcare entities with a duty to their patients, hired the most qualified applicants for each position.

Second, the EEOC is also seeking discovery with respect to the application of Defendants' other policies, including their FMLA policies, even though such policies were not part of the EEOC's investigation into Ms. Casterline's allegations. It is hard to understand the legal basis for expanding the initial phase of discovery in this manner, especially when considering the significant cost involved with such discovery.

Quite frankly, and with all due respect to the EEOC, it appears as though the attempt to expand discovery in this manner directly relates to the EEOC's prior lack of successful challenge to most qualified applicant policies. Indeed, as outlined above in Section I (pp. 2 – 4), appellate courts across the country have repeatedly rejected the EEOC's argument that employers must ignore their most qualified applicant policies and automatically reassign an employee returning

from non-FMLA leave into any open position, despite the employee's overall qualifications for the position or if there is a more qualified applicant for the position. In fact, the EEOC unsuccessfully argued this position a mere three (3) months before rendering its initial Letter of Determination in this matter. *See Elledge*.

Interestingly enough, in the matters outlined above, the EEOC did not seek relief on behalf of an aggrieved class; it simply challenged or supported the challenge to the policies at issue – similar to the EEOC's underlying investigation into this matter. It appears as though the EEOC has revised its litigation strategy in these types of matters in an attempt to force employers into revising their ADA-compliant policies. In other words, by expanding the scope of discovery to include other employees as well as other policies prior to determining whether the actual policy at issue is unlawful, the EEOC can force employers to incur hundreds of thousands of dollars in discovery costs – gaining significant leverage over employers. This may even force employers to change their ADA-compliant policies to avoid incurring such costs, allowing the EEOC to effectively legislate as an agency. This simply should not be permitted, especially when such actions go well beyond the EEOC's underlying administrative investigation. Accordingly, discovery in this matter should initially be limited to liability – on the allegedly discriminatory policies.

### A. *The Claim will be disposed of through Motion*

As noted above, discovery regarding "application of its discriminatory policies and practices" will likely be rendered moot through Defendants' anticipated Rule 12 Motion and/or through a Motion for Summary Judgment. In particular, as outlined throughout this Brief as well as in the Motion for Reconsideration Letter Brief attached hereto as Exhibit A, the EEOC's claim that Defendants' most qualified applicant policy violates the ADA will ultimately be dismissed.

If the policy or policies are declared permissible – in accordance with *Barnett* and its progeny – any discovery about employees impacted by application of these same policies would have been an avoidable waste of time, expense and resources.  In other words, should the Parties be forced into the discovery requested by the EEOC – at the severe prejudice of Defendants – they will surely become entangled in discovery that may, and most likely will, become irrelevant.

To further articulate this point, it is worth noting the substantively similar private claim raised in *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480 (8th Cir. 2007).  In *Huber*, the plaintiff employee, who worked as a grocery clerk (*i.e.*, filling orders), hurt her arm and could not fulfill her job duties. *Huber*, 486 F.3d at 481.  The plaintiff employee then sought automatic reassignment to a router position as an accommodation.  *Id*.  However, the employer, Wal-Mart, pursuant to its most qualified applicant policy, hired the most qualified candidate. *Id*.  The plaintiff "filed suit under the ADA, arguing she should have been reassigned to the router position as a reasonable accommodation for her disability."  *Id*. at 482.

The trial court initially granted summary judgment in favor of the plaintiff; however, the Eighth Circuit reversed and entered judgment in favor of Wal-Mart, holding that the ADA is not an affirmative action statute and does not require reassignment when doing so would violate a policy of hiring the most-qualified candidate.  *Id.* at 484; *accord Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 916 (8th Cir. 2013) (affirming summary judgment for employer, noting, in part, "[defendant] attempted to accommodate [plaintiff] and engaged in an interactive dialogue by giving him the option of applying for non-DOT-qualified jobs at the company.") (quotations omitted) (citing *Fjellestad v. Pizza Hut of Am., Inc*., 188 F.3d 944, 954 (8th Cir. 1999)).

Ms. Casterline's claim mirrors the *Huber* claim.  The EEOC, seeking relief for Ms. Casterline, alleges that Casterline was "fired" (or not reassigned) due to Defendants' policy of

hiring/reassigning the most qualified candidates for any and all open positons. (Doc. 1, ¶ 20(s)). Defendants, as healthcare entities, apply such a policy as "the well-being and even the lives of patients can depend on having the best-qualified personnel" and "undermining a hospital's best-qualified hiring or transfer policy imposes substantial costs on the hospital and potentially on patients." *St. Joseph's Hospital, Inc.*, 842 F.3d at 1345.

The takeaway is that there is a threshold legal question this Honorable Court should address concerning whether the ADA requires the relief sought. It makes little sense to engage in extensive discovery to determine whether there are others similarly "aggrieved" as Ms. Casterline (*i.e.*, impacted by the policy) before addressing this threshold issue, especially considering the plethora of caselaw supporting the legality of the policies at issue.

### B. *Cost cannot be ignored*

As mentioned during the preliminary pretrial conference held on November 30, 2021, in practice, the EEOC's current discovery requests present significant costs. Defendants, in total, employ approximately 24,000 employees at any given time. The pending EEOC discovery requests ask for information about employees seeking leave for almost a four (4) year period. Defendants would need to assign a team of its employees to comb through electronic and personnel records. It is not unrealistic to expect hundreds or even thousands of employees could be implicated given the current breadth of the requests – especially considering the EEOC is attempting to expand its discovery requests to address additional policies that were not part of its underlying investigation. *See* Exhibit B. In terms of data storage costs alone (*i.e.*, archiving email requests and personnel files), the information/documentation sought will likely cost hundreds of

thousands of dollars.[5]  This figure does not take into account the lost revenue and operational costs related to the internal reassignment of a team of individuals to work on this litigation as opposed to completing their employment responsibilities.  Moreover, the projection does not account for legal review, nor does it account for the fact that Defendants, as healthcare entities, are currently at the forefront of battling the COVID-19 pandemic and do not have the luxury of being able to easily divert resources.  Bottom line: engaging in discovery that may be unnecessary is nonsensical, especially considering the extreme cost in terms of real dollars and resources associated with it.

### C. *Rules and precedent permit and encourage limited discovery and/or bifurcation*

This Honorable Court certainly has the legal authority to conduct litigation in a manner it deems reasonable under the circumstances. Federal Rule of Civil Procedure 26 explicitly provides the basis for this Honorable Court to limit the scope of discovery.  Fed. R. Civ. P. 26(a)(1).   In the interests of judicial economy, Federal Rule 42 affords this Honorable Court the power to consolidate or separate trials, as well as enter orders to avoid unnecessary cost.  Fed. R. Civ. P. 42.

Moreover, litigation involving the EEOC has, at times, warranted bifurcating discovery. One method of bifurcation, frequently called the *Teamsters* framework after a landmark Supreme Court decision, creates a multi-stage evidentiary framework.  *See EEOC v. PMT Corp.*, 124 F.Supp.3d 904, 907-909 (D. MN. 2015) (discussing *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324 (1977).  *Teamsters* serves as an alternative burden shifting method to the oft cited *McDonnell Douglas* burden shifting framework utilized in run-of-the-mill discrimination claims. *Id*. at 908.  In fact, the EEOC has pushed to apply the *Teamster* framework in other matters.  *See*

---

[5] The undersigned counsel offers this projection based on prior experience with other eDiscovery data retrievals and exchanges.  In all candor, Defendants are offering a conservative figure.

*EEOC v. Mavis Discount Tire*, 129 F.Supp.3d 90 (S.D.N.Y. 2015); *EEOC v. Lawler Foods, Inc.*, 128 F.Supp.3d 972 (S.D. Tx. 2015).

The *Teamsters* framework places the initial burden on the EEOC to make out a *prima facie* claim of discrimination. *PMT Corp.,* 124 F.Supp.3d at 908. During the first stage, referred to as the liability stage, the EEOC does not offer evidence of each person for whom it seeks relief. *Id.* Rather, the EEOC has the burden to establish a *prima facie* claim that a discriminatory policy actually existed. *Id.* This generally requires the EEOC to "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Equal Emp't Opportunity Comm'n v. JBS USA, LLC*, Civ. Action No. 10–cv–02103–PAB–KLM, 2011 WL 3471080, at *2 (D.Colo. Aug. 8, 2011) (quoting *Teamsters*, 431 U.S. at 336). "To recover under a pattern or practice theory, discrimination must be 'the company's standard operating procedure[—]the regular rather than the unusual practice." *Id.* (quoting *Teamsters*, 431 U.S. at 336). "The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers."). *PMT Corp.,* 124 F.Supp.3d at 908 (quoting *Teamsters*, 431 U.S. at 336).

If satisfied, the burden shifts to the employer to rebut the government's proof. *Id.* Then, if necessary, additional proceedings occur after the liability phase to determine the scope of individual relief. *Id.*

Although Defendants do not believe the *Teamsters* analysis should be specifically applied in this matter; it has been offered to this Honorable Court and to the EEOC as an example of a framework for bifurcating discovery on the issue of liability and discovery relating to potentially "aggrieved" employees. Defendants attempted to discuss this issue with the EEOC, in particular their extremely costly discovery concerns. Unfortunately, even after multiple conversations,

Defendants do not understand the EEOC's rationale for conducting full blown discovery as opposed to initially focusing on liability in order to streamline this matter in a cost effective and efficient manner.

## V.    Conclusion

For the reasons outlined above, Defendants respectfully request this Honorable Court limit and/or bifurcate discovery in an appropriate manner.  The resources of this Honorable Court and of the Parties would be wasted by the EEOC's proposed scope and method of discovery.  The logical manner of discovery would be to first evaluate if the Defendants' policy is impermissible as a matter of law.  If, and only if, this Honorable Court determines that Defendants' policies are improper should the Parties expend their internal resources and hundreds of thousands of dollars to assess hundreds of personnel records spanning several years to find those, if any, who may have been "aggrieved."  At the very least, Defendants should be given the opportunity to file their anticipated Rule 12 Motion, addressing and potentially disposing of the majority, if not all, of the legal issues involved in this matter – prior to incurring the significant and potentially unnecessary expense of discovery, and, even more importantly, prior to Defendants being forced to divert internal resources from providing necessary healthcare services to the public during the COVID-19 pandemic.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

*/s Anthony (T.J). Andrisano*
Anthony (T.J.) Andrisano (PA 201231)
Jacob Sulzer (PA 313089)
409 N. Second Street, Suite 500
Harrisburg, PA 17101
anthony.andrisano@bipc.com
jacob.sulzer@bipc.com

Melissa Murphy Weber (PA 76959)
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102-2555
melissa.weber@bipc.com

*Counsel for Defendants*

Dated:  December 30, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that a true and complete copy of the foregoing document was transmitted

by Electronic Mail upon the following parties this day:

Jessi D. Isenhart, Esq.
Sabrina Brown, Esq.
U.S. Equal Employment Opportunity Commission
Cleveland Field Office
1240 E. 9th Street, Suite 3001
Cleveland, OH 44199
JESSI.ISENHART@EEOC.GOV
SABRINA.BROWN@EEOC.GOV

Melissa Murphy Weber

Dated:  December 30, 2021