UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | CIVIL ACTION NO. 21-4294 |
| Plaintiff, | ) ) | |
| v. | ) ) | AMENDED COMPLAINT |
| GEISINGER HEALTH, GEISINGER HEALTH SYSTEM FOUNDATION d/b/a GEISINGER HEALTH SYSTEM, GEISINGER WYOMING VALLEY MEDICAL CENTER, GEISINGER CLINIC, GEISINGER HEALTH PLAN, GEISINGER MEDICAL CENTER, and GEISINGER HOLY SPIRIT HOSPITAL, | ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMAND |
| Defendants. | ) ) | |

NATURE OF THE ACTION

This is an action under Title I and Title V of the Americans with Disabilities Act of 1990, as amended (ADA), and Title I of the Civil Rights Act of 1991, to correct violations of the ADA and to provide appropriate relief to a class of aggrieved former and current employees, including but not limited to charging party Rosemary Casterline, whose rights secured by the ADA were violated by Geisinger Health, Geisinger Health System Foundation d/b/a Geisinger Health System, and/or the other named Defendants ("Geisinger").

As alleged with greater particularity below, Geisinger has discriminated against Casterline and a class of former and current employees in violation of the ADA by failing to make reasonable accommodations relating to their disabilities.  Specifically:

(1)      Geisinger has maintained and continues to maintain a policy and practice of limiting the amount of time Geisinger will hold an employee's position for the employee during leave relating to the employee's disability to twelve weeks of Family and Medical Leave (FMLA) leave or, when the employee is not eligible for FMLA leave, eight weeks of non-FMLA leave.

1

(2) Geisinger has applied and continues to apply a most-qualified applicant policy or practice to disabled employees in need of reassignment, such that Geisinger refuses to transfer a disabled employee in need of reassignment to another vacant position for which they are qualified as an accommodation of their disability unless the employee competes for the position and is selected as the "most qualified" candidate, and Geisinger fires an employee in need of reassignment as an accommodation unless Geisinger concludes the employee is the "most qualified" person for a vacant position.

Geisinger further violated the ADA by discriminating against Casterline and a class of former and current employees by discharging them, refusing to return them to work, or failing to transfer or hire them based on disability or the need to make reasonable accommodations; retaliating against them for seeking reasonable accommodations or opposing Geisinger's unlawful actions in violation of the ADA; and interfering with them in the exercise or enjoyment of, or on account of their exercise or enjoyment of, rights protected by the ADA.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and

enforcement of Title I and Title V of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.      At all relevant times, Defendant, Geisinger Health, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania, including in the City of Langhorne and in the City of Wilkes-Barre, and has continuously had at least 15 employees.

5.      At all relevant times, Defendant, Geisinger Health System Foundation d/b/a Geisinger Health System ("Geisinger Health System"), has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Wilkes- Barre, and has continuously had at least 15 employees.

6.      At all relevant times, Defendant, Geisinger Wyoming Valley Medical Center, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Wilkes-Barre, and has continuously had at least 15 employees.

7.      At all relevant times, Defendant, Geisinger Clinic, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Mountain Top, and has continuously had at least 15 employees.

8.      At all relevant times, Defendant, Geisinger Health Plan, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Danville, and has continuously had at least 15 employees.

9.      At all relevant times, Defendant, Geisinger Medical Center, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Danville, and has continuously had at least 15 employees.

10.     "Geisinger Holy Spirit Hospital" refers to an entity formerly known as Holy Spirit

Hospital of the Sisters of Christian Charity, Inc. d/b/a Geisinger Holy Spirit Hospital, from which EEOC seeks relief in this action for the period during which it operated as an integrated enterprise or single employer with Geisinger Health/Geisinger Health System, was under the control, supervision, coordination, or corporate parentage of Geisinger Health/Geisinger Health System, or otherwise subjected persons working for it to the Geisinger Health/Geisinger Health System policies and unlawful employment practices described herein.[1]

11.     At all relevant times, Defendant, Geisinger Holy Spirit Hospital, has been incorporated in Pennsylvania and has continuously been doing business in the State of Pennsylvania and the City of Camp Hill, and has continuously had at least 15 employees.

12.     At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C.§§ 12111(5), (7).

13.     At all relevant times, Defendants have been covered entities under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

14.     At all relevant times, Geisinger Health/Geisinger Health System and its affiliates, subsidiaries, and entities, including but not limited to the other named Defendants, have operated in such a manner as to constitute an integrated enterprise or a single employer.

15.     At all relevant times, Geisinger Health/Geisinger Health System has coordinated, supervised, and controlled the activities of its affiliates, subsidiaries, and entities, concerning various employment matters such as granting or denying accommodations like medical leave, hiring, rehiring, termination, and requiring those entities and persons employed or seeking employment at their worksites to comply with Geisinger Health/Geisinger Health System employment policies

---

[1] Upon information and belief, Holy Spirit Hospital of the Sisters of Christian Charity, Inc. is now known as Penn State Health Holy Spirit Medical Center.

including the policies identified herein.

16.     At all relevant times, Geisinger Health/Geisinger Health System required its affiliates, subsidiaries, and entities, including but not limited to the other named Defendants, to comply with discriminatory policies and practices relating to leave and reassignment, including but not limited to (1) Geisinger's policy and practice of limiting the amount of time it will hold an employee's position for the employee during leave relating to the employee's disability to twelve weeks of Family and Medical Leave (FMLA) leave or eight weeks of non-FMLA leave and (2) Geisinger's application of its most-qualified applicant policy to employees in need of reassignment as an accommodation of a disability. Pursuant to these policies and practices, Geisinger Health/Geisinger Health System required its affiliates, subsidiaries, and entities, including but not limited to the other named Defendants, to deny reasonable accommodations such as leave and reassignment and terminate employees in violation of the ADA.

17.     Geisinger's discriminatory leave and reassignment policies and practices are reflected, in part, in written policy documents that state on their face that they apply to Geisinger Health, Geisinger Wyoming Valley Medical Center, Geisinger Clinic, Geisinger Health Plan, Geisinger Medical Center, and Geisinger Holy Spirit, along with numerous other entities.

18.     The written policy documents present the entities to which they apply as a single employer, referring throughout to the subject employer as "Geisinger," "Geisinger Health System," and "GHS," and stating on their face that, throughout the policies, "the term 'Geisinger' shall refer to the entire Health Care System comprised of Geisinger Health ('GH') as parent and all subsidiary corporate entities comprising the Health Care System."

19.     On the website Geisinger.org, Geisinger Health's subsidiaries, affiliates, and entities are also presented to the public as a single entity and a single employer referred to as "Geisinger," which employs 24,000 employees and "comprises ten hospital campuses, two research centers, a

college of medicine, and a 550,000-member health plan." The website identifies Geisinger's hospital campuses and other locations to include, among others, Geisinger Wyoming Valley Medical Center, Geisinger Medical Center, and Geisinger Clinic locations and identifies its health plan as Geisinger Health Plan.

20.     Geisinger Health and its subsidiaries, affiliates, and entities also share the same personnel, forms, and resources to manage employee requests for reasonable accommodations, complaints of discrimination or retaliation, and recruiting and hiring.

21.     Geisinger uses a common packet of forms across Geisinger Health subsidiaries, affiliates, and entities for employees and their health care providers to complete when employees are seeking accommodations of a disability. Similar to Geisinger's written policy documents, the accommodation packet forms state, "Throughout this document, the term "Geisinger" shall refer to the entire health care system comprised of Geisinger Health ('GH') as parent and all subsidiary corporate entities." The packet directs employees of any such entities to return their completed forms to a single email address.

22.     Geisinger maintains harassment and retaliation policies that are reflected in written policy documents that, like the leave and transfer written policy documents, state on their face that they apply to Geisinger Health, Geisinger Wyoming Valley Medical Center, Geisinger Clinic, Geisinger Heath Plan, Geisinger Medical Center, and Geisinger Holy Spirit, along with numerous other entities.

23.     The harassment and retaliation written policy documents also refer throughout to the subject employer as "Geisinger," "Geisinger Health System," and "GHS," and state on their face that, throughout the policies, such terms refer "to the entire Health Care System" comprised of "Geisinger Health ('GH') as parent" or "Geisinger Health System Foundation (the 'Foundation') as parent" "and all subsidiary corporate entities comprising the Health Care System."

24.     The harassment and retaliation written policy documents direct employees of all such entities to a single Corporate Compliance telephone number and a single employee/compliance hotline number to report harassment and retaliation.

25.     Geisinger also posts vacancies for positions with various Geisinger Health subsidiaries, affiliates, and entities on a single jobs.geisinger.com website for external applicants, where such entities are referred to as "Departments" of Geisinger, and on a separate single website for internal applicants.   Applicants can apply for jobs with any of various Geisinger Health subsidiaries, affiliates, and entities through these two websites.

26.     Further, when Casterline worked with Geisinger's recruiter to try to find a position for reassignment after Geisinger refused to continue to hold her position for her during her medical leave, the recruiter assisted her with applying to jobs both within Geisinger Wyoming Valley Medical Center, where she worked, and at other entities, including but not limited to Geisinger Health Plan.

27.     While Casterline applied for positions at multiple Geisinger entities when she was seeking reassignment, she received all confirmations of her applications and all rejection notices from the same email address, regardless of which entity she had applied with.

28.     Geisinger Health and its subsidiaries, affiliates, and entities also historically have had, and continue to have, a high degree of unity of management through common officers.

29.     Current Geisinger Health president Dr. Jaewon Ryu also serves as president of Geisinger Wyoming Valley Medical Center, Geisinger Medical Center, and Geisinger Clinic and is identified on Geisinger.org as the current president and chief executive officer of "Geisinger."

30.     Current Geisinger Health vice president Steven Bender also serves as secretary of Geisinger Wyoming Valley Medical Center, Geisinger Medical Center, Geisinger Clinic, and Geisinger Health Plan and is identified on Geisinger.org as the current Chief Legal Officer for "Geisinger."

31.     Current Geisinger Health vice president Kevin V. Roberts also serves as vice president of Geisinger Wyoming Valley Medical Center, treasurer of Geisinger Medical Center, treasurer of Geisinger Clinic, and treasure of Geisinger Health Plan and is identified on Geisinger.org as the current executive vice president and chief financial officer of "Geisinger."

32.     Current Geisinger Health vice president Kurt Wrobel also serves as president of Geisinger Health Plan.

33.     Current Geisinger Health assistant secretary Lori Gramley also serves as assistant secretary of the entity formerly known as Holy Spirit Hospital of the Sisters of Christian Charity, Inc. and formerly doing business as Geisinger Holy Spirit Hospital, and she also has served as assistant secretary of Geisinger Medical Center and Geisinger Clinic.

34.     Publicly available information from the Pennsylvania Secretary of State website further identifies the same registered office address—100 N. Academy Avenue in Danville, Pennsylvania—for Geisinger Health, Geisinger Wyoming Valley Medical Center, Geisinger Medical Center, Geisinger Clinic, and Geisinger Health Plan.

35.     Publicly available information from the Pennsylvania Secretary of State website further identifies 100 N. Academy Avenue in Danville, Pennsylvania as the office of every officer of the entity formerly known as Holy Spirit Hospital of the Sisters of Christian Charity, Inc. and formerly doing business as Geisinger Holy Spirit Hospital.

<u>ADMINISTRATIVE PROCEDURES</u>

36.     More than thirty days prior to the institution of this lawsuit, Rosemary Casterline filed a charge with the Commission alleging that her employer discriminated against her in violation of the ADA.

37.     On February 12, 2021, the Commission issued to Defendants a Letter of Determination finding reasonable cause to believe that the ADA was violated and inviting

Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

38.     On June 1, 2021, the Commission issued to Defendants a Notice of Failure of Conciliation advising Defendants that the Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

39.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

40.     Since at least January 1, 2018, Defendants have violated Title I of the ADA, 42 U.S.C. §12112(a) and (b), and Title V of the ADA, 42 U.S.C. § 12203, when they discriminated against Casterline and a class of aggrieved former and current employees with disabilities within the meaning of the ADA, 42 U.S.C. § 12102(1), who were qualified individuals under the ADA, 42 U.S.C. § 12111(8), by failing to make reasonable accommodations to such persons' known physical or mental limitations; discharging them, refusing to return them to work, or failing to transfer or hire them based on disability or the need to make reasonable accommodations; retaliating against them for seeking reasonable accommodations or opposing Geisinger's unlawful actions in violation of the ADA; and interfering with them in the exercise or enjoyment of, or on account of their exercise or enjoyment of, rights protected by the ADA.

41.     EEOC seeks relief for such violations for a class of aggrieved persons who are current and former employees of Geisinger, who are qualified individuals under the ADA, 42 U.S.C. § 12111(8), with a physical or mental impairment that substantially limits one or more major life activities and/or a record of such an impairment under 42 U.S.C. §12102(1), and who either (1) were denied the opportunity to return to work in their own positions after twelve weeks of FMLA leave relating to their disabilities or eight or more weeks of non-FMLA leave relating to their disabilities or (2) were unable to continue working or return to work in their own positions (because Geisinger

did not accommodate them or because no accommodations would permit such continuation or return) and were denied reassignment to, transfer to, or hire/rehire in vacant positions for which they were qualified with or without an accommodation. The class includes Casterline who has impairments, including recurring rotator cuff injuries and complications/impairments flowing from such injuries, that substantially limit major life activities, and/or has a record of such impairments.

42.　Geisinger Health/Geisinger Health System has at all relevant times been a corporate parent to, and has coordinated and supervised the activities of, all Geisinger Health/Geisinger Health System affiliates, subsidiaries, and entities, including but not limited to Defendants Geisinger Wyoming Valley Medical Center, Geisinger Clinic, Geisinger Heath Plan, Geisinger Medical Center, and Geisinger Holy Spirit Hospital.

43.　Geisinger Health/Geisinger Health System maintained, and continues to maintain, employment policies that apply to its subsidiary corporate entities, which include or have included but are not limited to Defendants Geisinger Wyoming Valley Medical Center, Geisinger Clinic, Geisinger Heath Plan, Geisinger Medical Center, and Geisinger Holy Spirit Hospital; such policies govern all such Geisinger entities or facilities and persons working at those entities or facilities, including the class of aggrieved persons described herein and Casterline.

44.　At all relevant times, Geisinger Health/Geisinger Health System has maintained and continues to maintain a discriminatory policy and practice of limiting the amount of time Geisinger will hold an employee's position for the employee during leave relating to the employee's disability to 12 weeks of FMLA leave or, when the employee is not eligible for FMLA leave, eight weeks of non-FMLA leave, and Geisinger Health/Geisinger Health System has required its subsidiary corporate entities, including but not limited to the other named Defendants, to apply that policy and practice.

45.　At all relevant times, Geisinger Health/Geisinger Health System has maintained and

continues to maintain a discriminatory policy and practice of refusing to transfer a disabled employee in need of reassignment to another vacant position for which they are qualified as an accommodation of their disability unless the employee competes for the position and is selected as the "most qualified" candidate, and Geisinger Health/Geisinger Health System has required its subsidiary corporate entities, including but not limited to the other named Defendants, to apply that policy and practice.

46.     Pursuant to the discriminatory policies and practices described above, ADA-covered employees for whom leave with the opportunity to return to their positions would be a reasonable accommodation are denied such leave and are instead forced to apply and compete for their own positions or alternative positions.

47.     Pursuant to the discriminatory policies and practices described above, ADA-covered employees must apply and compete for employment opportunities including reassignment, even where such opportunities constitute a reasonable accommodation.

48.     Pursuant to the discriminatory policies and practices described above, ADA-covered employees for whom an employment opportunity or reassignment would be a reasonable accommodation are fired unless Defendants conclude they are the "most qualified" person for an opportunity.

49.     Geisinger Health/Geisinger Health System requires Defendants to enforce the discriminatory policies and practices described above and, as a result, requires Defendants to deny ADA-covered employees reasonable accommodations, including leave and reassignment, and terminate ADA-covered employees in violation of the ADA.

50.     Pursuant to the discriminatory policies and practices described above, even if an employment opportunity exists for which an ADA-covered employee is qualified, and hiring or reassigning that employee to the position would constitute a reasonable accommodation,

Defendants will not hire or reassign the employee, or otherwise permit them to remain employed with Defendants, unless Defendants conclude that they are the "most qualified" person for the opportunity.

51.     Defendants also provide misleading information and/or misrepresent and/or manipulate employment opportunities, interfere with the enjoyment or exercise of rights secured under the ADA, prevent persons from obtaining accommodations, and/or retaliate against persons for having exercised their rights, by manipulating or removing postings, altering or misrepresenting information about vacancies, changing departmental availability, selecting persons for vacancies on an expedited basis so as to deprive an ADA-covered person or a person who has engaged in protected activity from obtaining an employment opportunity, and otherwise reducing or eliminating employment opportunities for those whose rights are protected by the ADA.

52.     Defendants also create and maintain records that associate negative tags or references, such as "litigation hold," with persons who have engaged in protected activity and/or those who have exercised their rights under the ADA such as seeking a reasonable accommodation or putting Defendants on notice that they may need to provide such an accommodation.  Such records are available to Defendants' personnel including persons who may be involved in the process of selecting persons for employment opportunities and accommodations, including reassignment.

53.     A class of aggrieved persons and Casterline were adversely affected by Defendants' policies and conduct, as described above.

54.     Casterline worked at Geisinger Wyoming Valley Medical Center as a Registered Nurse (RN) for more than 30 years.  Casterline was an excellent employee and had a variety of experience in different capacities and departments, including the ophthalmology department, where she was last employed by Geisinger, the cardiac care department, and others.

55.     Since prior to October 2017, Casterline has suffered from injuries to her left shoulder

that have caused her severe pain and substantial limitation in her ability to perform major life activities. Since at least early 2018, Casterline has suffered from an injury to her right shoulder that has caused the same types of pain and limitations.

56. At all relevant times, Casterline's shoulder conditions have caused her to have substantial limitations in the use of her arms and shoulders, including but not limited to substantial limitations to her ability to lift, reach, bear weight with her arms, dress herself, and maintain her household by activities such as doing laundry and grocery shopping.

57. For example, at all relevant times, Casterline's shoulder conditions have substantially limited her range of motion in her arms; have kept her from lifting or reaching for items above her because doing so causes severe pain; have caused her to tremble when holding her arms in front of her and to drop items; have required her to wear larger, looser, or alternative types of clothing items to be able to dress herself; and have made it difficult to load and unload laundry from her washing machine or to load and unload groceries or other items from her vehicle.

58. Casterline's shoulder conditions also have caused her to suffer severe pain that has substantially interfered with her ability to sleep, concentrate, and communicate effectively. For example, Casterline's shoulder conditions have caused her to be unable to sleep on her side and have resulted in reduced sleep. The pain she experienced has caused her to perform tasks more slowly due to interference with her concentration, to interrupt her communications with others with expressions of pain, and to avoid talking to others when she is in severe pain.

59. At all relevant times, Geisinger has been aware of the injuries to both of Casterline's shoulders and the limitations they caused.

60. Casterline had surgery to repair a torn left rotator cuff in October 2017, for which she requested and took twelve weeks of approved medical leave at that time.

61. Within a few months after the October 2017 surgery, Casterline tore her right rotator

cuff and then re-tore the left rotator cuff.

62.     In October 2018, Casterline informed Defendants that she required reverse shoulder replacement surgery for the injury to her left rotator cuff, and she took approved medical leave with an approximate return date of December 25, 2018.

63.     Following Casterline's October 2018 surgery, Casterline experienced increased limitations to her use of her left arm and shoulder beyond those identified in paragraphs 56 through 58 above.  For example, for a time during her medical leave, she had to stop what she was doing to apply ice or heat to her shoulder multiple times a day; she required assistance with showering and dressing; and she was required to avoid moving her left arm or shoulder on her own at all.  During her leave she also had to attend physical therapy appointments multiple times a week.

64.     In December 2018, Casterline suffered complications with her left shoulder for which an additional four weeks of recovery time was needed. Accordingly, Casterline sought such leave consistent with her medical limitations. However, Geisinger refused to provide Casterline with additional job-protected leave and informed her that it would not hold her position for her for the additional time she needed.

65.     During Casterline's additional recovery time, she further experienced increased limitations to her use of her left arm and shoulder, including but not limited to having to avoid moving her left arm or shoulder on her own at all.

66.     Geisinger did not immediately post Casterline's position when her recovery time was extended. Instead, on or about January 18, 2019, shortly before Casterline was expected to return from leave, Defendants posted Casterline's position as vacant and available.

67.     On January 24, 2019, Casterline informed Geisinger that she had an appointment with her surgeon scheduled for the following day and expected to be released to return to work at that time.

68.     On January 25, 2019, Casterline was cleared to return to work effective January 28, 2019.

69.     Since being cleared to return to work on January 25, 2019, Casterline has continued to have substantial limitations in the use of her arms and shoulders.

70.     Due to Casterline's October 2018 surgery and since that time, for example, her range of motion with her left arm is substantially and permanently reduced. Casterline further continues to be substantially limited at least in her abilities to lift or reach items above her, bear weight of more than a few pounds with her arms, dress herself, and maintain her household, and she continues to suffer from substantial pain from her right shoulder condition.

71.     Casterline sought to return to work in her position in accordance with her doctor's release, notifying Defendants of the release immediately on January 25, 2019.

72.     Although Defendants were notified that Casterline was cleared to return to work they did not allow her to return to her position. Instead, Defendants told Casterline that if she wanted to continue working for Defendants she would have to apply for her own job. In the meantime, Casterline was without a job.

73.     By January 25, 2019, Defendants were on notice that Casterline was ready to return to work and that she would, in compliance with their directives, "apply" to remain employed with Defendants in her own position.

74.     On or about January 25, 2019, however, the posting for Casterline's position was taken down from Geisinger's website at the request of management over the department.

75.     On January 26, 2019, one day after Casterline asked to return to work pursuant to her health care provider's release, management over Casterline's department expressed disinterest in returning Casterline to work in her position, complaining of how much medical leave she had taken since 2017.

76.     On January 26 and 27, 2019, Casterline attempted to "apply" for her own position via Geisinger's website but was unable to do so.

77.     When Casterline asked Defendants about the change and her status, they told her that management decided to remove the posting for her job and would not reopen it or otherwise permit her to return to her position.

78.     Defendants told Casterline that she would have to apply and compete for another position and succeed in obtaining one within a limited period or be fired.

79.     At that time, Geisinger had not filled Casterline's position.

80.     Since December 25, 2018, Geisinger has had vacancies in numerous positions for which Casterline was qualified.

81.     During the period of February 2019 through July 2019, Casterline sought reassignment with Geisinger by repeatedly asking Geisinger's recruiter to refer vacant positions for which she would be qualified to her and by applying to numerous positions for which she was qualified, including at least 19 nursing positions.

82.     Casterline's applications for Geisinger nursing positions included but were not limited to applications submitted on February 6, 2019, February 13, 2019, February 25, 2019, March 14, 2019, March 19, 2019, March 26, 2019, May 8, 2019, May 16, 2019, May 29, 2019, June 16, 2019, and July 11, 2019.

83.     Defendants' recruiter for the positions Casterline applied for confirmed that Casterline was qualified for them.

84.     Despite Casterline's applications for numerous positions and her confirmed qualification for them, Defendants refused to hire, rehire, or reassign her in any position, or otherwise comply with their obligations under the ADA.

85.     Casterline never received a response from Geisinger for some of the positions she

applied for.

86.     For some of the positions Casterline applied for, Defendants advised Casterline in writing that she had not been selected for employment opportunities and purported to assert the reason for their action. However, nowhere in the written notification did Defendants say that Casterline was unqualified for any of the positions, that she was not the "most qualified" candidate, or even that Defendants had considered her for any position; instead, Defendants told Casterline that they were "moving on to consider other candidates."

87.     Geisinger sent Casterline written notifications of her non-selection on at least March 25, 2019, April 16, 2019, May 23, 2019, June 6, 2019, June 11, 2016, July 9, 2019, and October 14, 2019.

88.     Casterline repeatedly objected to the discrimination Geisinger was subjecting her to, including but not limited to in communications in January, February, March, April, and May 2019 with Geisinger human resources personnel and the union representing nurses at Geisinger Wyoming Valley Medical Center.

89.     A grievance meeting regarding the discrimination to which Casterline had been subjected, including but not limited to the loss of her position, was scheduled between the union and management over Casterline's department and human resources in the second half of February or early March 2019.

90.     On May 16, 2019, Defendants notified Casterline that her employment had been terminated effective March 28, 2019. Prior to May 16, 2019, no one had informed Casterline that she had been fired.

91.     Defendants contend that Casterline was fired because she was not the "most qualified" person for an opportunity within a limited period.

92.     As of March 28, 2019, however, at least two of the nursing positions for which

Casterline was qualified and for which she had applied with Geisinger that month were still vacant and available. The person ultimately selected for one of the positions was not even interviewed until May 2019, and the person selected for the other position did not accept an offer until the end of April 2019.

93.     The above facts, among others, demonstrate that Defendants discriminated against Casterline on the basis of an actual disability and/or a record of disability, in violation of Title I of the ADA, 42 U.S.C. § 12112(a) and (b), when they failed to provide Casterline with reasonable accommodations, including failing to provide her with appropriate leave combined with an opportunity to return to her own position and failing to reassign her to a vacant position for which she was qualified, manipulated her job posting to prevent Casterline from "applying" for her own job, refused to permit her to return to work, discharged her, and failed to transfer or hire/rehire her for any employment opportunity based on disability or the actual or perceived need to make reasonable accommodations.

94.     Defendants treated the class of other aggrieved persons for whom EEOC seeks relief—including but not limited to the aggrieved persons named herein—similarly to Casterline, as alleged above, by discriminating against them on the basis of actual disabilities or records of disability, in violation of Title I of the ADA, 42 U.S.C. § 12112(a) and (b), when Defendants failed to provide them with reasonable accommodations, including failing to provide them with appropriate leave combined with the opportunity to return to their own positions and failing to reassign them to vacant positions for which they were qualified, manipulated or misrepresented job postings to prevent them from applying for them, refused to permit them to return to work, discharged them, and failed to transfer or hire/rehire them for employment opportunities based on disability or the need to make reasonable accommodations.

95.     The class of aggrieved persons for whom EEOC seeks relief includes Jodi Britton.

96. Britton worked at Geisinger for more than 10 years.

97. In her most recent position, Britton worked in a telephone nurse triage role, a role that was not patient-facing, for two years.

98. Britton has hypertension and ulcerative colitis, an autoimmune disorder affecting the gastrointestinal system, which put her at a higher risk of developing serious illness if she contracted COVID-19.

99. Britton also has an anxiety and panic disorder that exacerbates her autoimmune condition, as well as depression and attention deficit hyperactivity disorder.

100. At all relevant times, Britton's conditions substantially limited major life activities that include her digestive, respiratory, and musculoskeletal systems and substantially limited her ability to interact with others, care for herself, perform manual tasks, think, and concentrate.

101. At all relevant times, Geisinger was aware of Britton's medical conditions and the limitations they caused.

102. During the COVID-19 pandemic, because of her medical conditions and associated higher risk of developing serious illness if she contracted COVID-19, Britton could not work in a patient-facing role.

103. In April 2020, Britton provided a note from her health care provider requesting that she remain in a non-patient-facing role.

104. Upon receiving the note from her health care provider, Geisinger moved Britton *into* a patient-facing role even though Geisinger continued to need nurses to perform the telephone triage role.

105. Thereafter, Britton and her health care provider repeatedly requested that Geisinger accommodate her disability by returning her to a non-patient-facing role, including in October, November, and December 2020, but Geisinger refused to do so.

106. Britton was not eligible for FMLA leave.

107. In January 2021, Geisinger informed Britton she would be required to take a leave of absence beginning February 1, 2021 and told her that she would have to apply, compete, and be selected for another position within two months or face termination.

108. Shortly thereafter, Geisinger placed Britton on "litigation hold" status in view of potential hiring managers.

109. Later in January 2021, Britton wrote to Geisinger objecting to Geisinger's failure to provide her with a reasonable accommodation.

110. Despite having multiple vacant positions for which Britton was qualified, Geisinger did not reassign Britton or otherwise permit her to return to work.

111. Britton reached out to Geisinger multiple times, including in February, March, and April 2021, about positions she was qualified to perform and interested in applying to, but each time, Geisinger informed her that the position was not available to her.

112. The class of aggrieved persons for whom EEOC seeks relief also includes Christina Carpenter.

113. Carpenter worked for Geisinger as an Obstetrics and Gynecology Physician Assistant for thirteen years.

114. In February 2020, Carpenter was approximately seven weeks pregnant and was diagnosed with hyperemesis gravidarum, a condition that causes severe and life-threatening nausea and vomiting during pregnancy and often does not resolve until delivery of the baby.

115. Carpenter's condition substantially limited her ability to perform major life activities, including but not limited to eating, drinking, digestion, speaking, standing, walking, performing manual tasks, interacting with others, concentrating, and working.

116. Due to her condition, for example, Carpenter could not tolerate consuming food or

liquids; experienced vomiting that was triggered by light, sound, movement, or talking; was unable to drive due to weakness and difficulty concentrating due to nausea; and needed assistance with bathing due to weakness.

117.    Further, due to her condition, Carpenter had to receive fluids through a peripherally inserted central catheter (PICC) line for several hours each day and was admitted to the hospital several times.

118.    The PICC line further put Carpenter at high risk of infection, which required her to avoid close contact with others, including patients.

119.    At all relevant times, Geisinger was aware of Carpenter's condition and the limitations it caused.

120.    Because of Carpenter's condition, she needed medical leave.

121.    Carpenter requested and received twelve weeks of FMLA leave and was unable to return to work due to her continuing condition when her FMLA leave was exhausted in or around May 2020.

122.    After Carpenter exhausted the twelve weeks of FMLA leave, she requested and received additional non-FMLA leave.

123.    After Carpenter exhausted the twelve weeks of FMLA leave, however, Geisinger refused to hold her position for her any longer, claiming that the needs of the business required that the position be filled.

124.    At that time, Carpenter asked Geisinger to reconsider the decision not to hold her position for her during her leave, but Geisinger would not do so.

125.    Geisinger posted Carpenter's position in or around June 2020.

126.    Shortly after Geisinger posted Carpenter's position, Carpenter informed her supervisor that improvements she was seeing in her condition and potential changes in her treatment

plan may enable her to return to work in her position with reasonable accommodations in the next two to four weeks. While the treatment changes would decrease concerns about close contact with patients, Carpenter's condition would continue to substantially limit other major life activities, including at least eating, standing, walking, performing manual tasks, and concentrating until her delivery.

127.    When Carpenter informed her supervisor of her potential ability to return to work in the next two to four weeks, Geisinger took down the posting for Carpenter's position and told her that her position was being eliminated due to budget constraints.

128.    Two weeks later, Geisinger informed Carpenter that it was again moving forward with filling her position, but Geisinger did not repost the position, so Carpenter could not apply.

129.    The candidate selected for Carpenter's position did not begin working in the position until after Carpenter had given birth and was expected to return to work.

130.    When Carpenter was cleared to return to work following the birth of her child and sought to do so in November 2020, Geisinger required her to apply and compete for other positions and get selected as the most qualified candidate for a position within two months or face termination.

131.    Carpenter applied for five positions that she was qualified to perform with Geisinger, but Geisinger refused to hire or reassign her in any position, compelling Carpenter to accept employment with a different employer and resign from Geisinger effective December 21, 2020.

132.    The class of aggrieved persons for whom EEOC seeks relief also includes Michelle Glynn.

133.    Glynn began working for Geisinger in July 2019 in a Clinical Nurse position that required her to spend most of her time on her feet and moving about examination rooms.

134.    Glynn suffers from multiple disabilities that cause her chronic pain, including Lupus, fibromyalgia, and arthritis.

135.    At all relevant times Glynn's medical conditions substantially limited major life activities that include her breathing and cardiovascular system, as well as bending, among other aspects of her daily life.

136.    For example, Glynn's medical conditions caused her to suffer from frequent shortness of breath, a severely elevated heart rate, and substantial pain while performing her duties in the Clinical Nurse position with Geisinger.

137.    At all relevant times, Geisinger was aware of Glynn's medical conditions and the limitations they caused.

138.    In November and December 2019, Glynn requested accommodations of her conditions, including but not limited to reassignment to a soon-to-be vacant phone nurse position for which Glynn was qualified.

139.    In November 2019, Glynn's supervisor initially agreed to the reassignment, but after Glynn took a few days of medical leave for a medical procedure necessitated by her conditions, Geisinger denied her request for reassignment and her other requests for reasonable accommodation.

140.    Within about a week after Glynn's return to work following her medical procedure, Geisinger issued her a written warning regarding her performance and gave her two weeks to improve her performance.

141.    Geisinger terminated Glynn's employment two weeks later.

142.    The class of aggrieved persons for whom EEOC seeks relief also includes Marceline Ngassa.

143.    Ngassa began working for Geisinger in November 2018 as a certified nursing assistant.

144.    Ngassa has osteoarthritis, which causes severe pain in her legs, specifically in her knees and ankles.

145.     At all relevant times, Ngassa's condition substantially limited her in the performance of major life activities, including her ability to walk and stand for long periods of time.

146.     Ngassa informed her supervisor about her pain and took approximately 10 days off work to address her pain and consult with her doctor.

147.     Ngassa's doctor provided Geisinger with a written excuse for Ngassa's leave on May 28, 2019.  The excuse contained details regarding Ngassa's pain.

148.     Ngassa's doctor prescribed her medication and injections to help with her pain and provided her with a note for her employer stating that she could return to work with restrictions on how much walking and standing she did.

149.     On or about June 6, 2019, Ngassa presented the doctor's note to her supervisor, and her supervisor immediately denied her request and told her that Geisinger could not accommodate her.

150.     Ngassa then asked her supervisor if she could be assigned to a different position that did not involve as much time on her feet.  Her supervisor immediately denied this request as well and told Ngassa again that Geisinger could not accommodate her.

151.     Ngassa was not permitted to return to work thereafter.

152.     After Ngassa's supervisor denied her requested accommodations, Ngassa went to Geisinger's human resources office on three separate occasions to seek an accommodation of either staying in her current position with breaks to sit down, reassignment to a different position, or taking leave.   Ngassa further had multiple telephone calls with Geisinger human resources to seek accommodations.

153.     Human resources told Ngassa it could not accommodate her requests and that if she wanted a position with Geisinger, she should ask her doctor to change her note to permit her to work without restrictions.

154.    While Ngassa sought assistance from Human Resources, at the end of June 2019, Ngassa's doctor provided additional paperwork to Geisinger providing detailed information about her condition and limitations.

155.    Geisinger thereafter failed to reassign Ngassa to another position or otherwise accommodate her disability and terminated her employment in or about August 2019.

156.    The above facts, among others, further demonstrate that Geisinger retaliated against Casterline and other aggrieved persons for whom EEOC seeks relief, including at least Britton, Carpenter, Glynn, and Ngassa, because such aggrieved persons sought reasonable accommodations, opposed acts or practices made unlawful by the ADA, or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA, in violation of Title V of the ADA, 42 U.S.C. § 12203(a).

157.    Casterline engaged in protected activity, including but not limited to requesting accommodations or otherwise putting Geisinger on notice that it may have to provide reasonable accommodations, including at least seeking leave in October 2018; seeking additional leave in December 2018; seeking return to her position in January 2019 and in February through May, 2019 via communications with her union; seeking reassignment numerous times, including at least on February 6, 2019, February 13, 2019, February 25, 2019, March 14, 2019, March 19, 2019, March 26, 2019, May 8, 2019, May 16, 2019, May 29, 2019, June 16, 2019, and July 11, 2019; and objecting to Geisinger's discrimination, *inter alia*, in communications with human resources and the union in January, February, March, April, and May 2019.

158.    Following Casterline's engagement in protected activity, Geisinger subjected her to a pattern of antagonism and took adverse action against Casterline that closely followed her protected activity, including but not limited to when it denied her reasonable accommodations from at least December 2018 through October 2019; refused to hold her position for her in December 2018; posted

her position shortly before she was expected to return from leave, required her to apply and be selected as "most qualified" for her own position, manipulated her job posting to prevent Casterline from "applying" for her own job, including pulling the posting for her position down before she could apply, and refused to permit her to return to her position in January 2019; failed to reassign, transfer, or hire/rehire her thereafter despite having numerous openings for which she was qualified and applied in at least February, March, April, May, June, and July, 2019 and thereafter; and terminated her employment as set forth in paragraph 90 above.

159.    Other aggrieved persons for whom EEOC seeks relief, including at least Britton, Carpenter, Glynn, and Ngassa, engaged in protected activity, including but not limited to: opposing or complaining about/expressing disagreement with Defendants' conduct or policies described above; filing charges of discrimination or engaging in protected pre-filing communication with the EEOC; requesting or otherwise putting Defendants on notice that it may have to provide reasonable accommodations; and opposing or complaining internally about discrimination.

160.    Geisinger retaliated against persons who engaged in protected activity, including at least Britton, Carpenter, Glynn, and Ngassa, by, among other things, failing to reassign, hire, rehire, or otherwise permit such persons to retain or obtain employment opportunities; discharging them; manipulating postings, misrepresenting or changing availability or vacancy status, or otherwise interfering with the process for retaining employment or "applying" for employment; and denying equal/favorable terms and conditions and privileges of employment, including issuing performance improvement plans, deficiency notices, disciplinary action, and performance reprimands.

161.    The above facts, among others, further demonstrate that Geisinger interfered with Casterline and other aggrieved persons for whom EEOC seeks relief, including at least Britton, Carpenter, Glynn, and Ngassa, in their exercise or enjoyment of, or on account of their exercise or enjoyment of, rights granted or protected by the ADA, in violation of Title V of the ADA, 42 U.S.C.

§ 12203(b).

162.    Defendants engaged in unlawful interference by: refusing to hold Casterline's position for her through the end of her leave while failing to make or delaying efforts to reassign her to a vacant position for which she was qualified; refusing to allow Casterline to return to her position, or any other position with Defendants, unless she "applied" and was the "most qualified" for an employment opportunity; compelling Casterline be the "most qualified" candidate for an employment opportunity within a limited period or be fired; and interfering with Casterline's efforts to apply for her own position by manipulating, misrepresenting, or interfering with her application process and the posting/filling of her position.

163.    Defendants subjected other aggrieved persons for whom EEOC seeks relief, including at least Britton, Carpenter, Glynn, and Ngassa, to unlawful interference by, among other things, refusing to allow them to return to their own positions, or any other position with Geisinger, following leave relating to their disabilities, unless they "applied" and were the "most qualified" for an employment opportunity; requiring that they be the "most qualified" candidate for an employment opportunity within a limited period or be fired; interfering with their efforts to return to their own positions by manipulating, misrepresenting, or interfering with the posting/filling of those positions; and creating and maintaining records that associate them with negative tags or references, such as "litigation hold," and making such records readily available to personnel who may be involved in reassignment, transfer, or hiring/rehiring decisions.

164.    The effect of the practices complained of above has been to deprive Casterline  and the aggrieved class of current and former employees of equal employment opportunities and otherwise adversely affect their status as employees, because of their disabilities and protected activity.

165.    The unlawful employment practices complained of above were and are  intentional.

166.     The unlawful employment practices complained of above were and are done with malice or with reckless indifference to the federally protected rights of Casterline and the aggrieved class of current and former employees harmed by Defendants' unlawful policies and practices.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from: maintaining the policies and practices described above which deprive rights secured by the ADA; compelling ADA-covered individuals to apply and compete for employment opportunities including reassignment, requiring them to be the "most qualified" person to retain or obtain employment opportunities, and firing them for allegedly failing to do so; failing to provide reasonable accommodations, including leave, reassignment, and/or other accommodations whether alone or in combination; operating without effective mechanisms that require managers and human resources personnel to engage in a good-faith interactive process to identify the need, if any, for accommodations; operating without effective training, monitoring, and incentives to ensure compliance with the ADA; engaging in practices which dissuade, deter, or chill persons from enjoying or exercising rights secured by the ADA or which punish or retaliate against them for doing so; refusing to reassign, hire, rehire, or otherwise permit ADA-covered individuals from remaining employed with Defendants or obtaining employment opportunities; firing employees on the basis of disability; discriminating, retaliating, and engaging in unlawful interference as described above.

B.     Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of their past and present unlawful employment practices.

C.     Order Defendants to make whole Casterline and the aggrieved class harmed by

Defendants' unlawful policies and practices, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and/or appropriate front pay, for the period of March 26, 2019 through the present.

D.      Order Defendants to make whole Casterline and the aggrieved class harmed by Defendants' discriminatory unlawful employment practices by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above during the period of March 26, 2019 through the present, in amounts to be determined at trial.

E.      Order Defendants to make whole Casterline and the aggrieved class harmed by Defendants' unlawful policies and practices by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above during the period of March 26, 2019 through the present, in amounts to be determined at trial.

F.      Order Defendants to pay Casterline and the aggrieved class harmed by Defendants' unlawful policies and practices punitive damages for the period of March 26, 2019 through the present for Defendants' malicious and reckless conduct, as described above, in amounts to be determined at trial.

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

H.      Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

Respectfully submitted,

s/ Jessi Isenhart
JESSI ISENHART (PA Bar No. 206504)
Senior Trial Attorney
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Cleveland Field Office
1240 E. 9th Street, Suite 3001
Cleveland, OH 44199
jessi.isenhart@eeoc.gov
Phone: 216-306-1121

*Counsel for EEOC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. All parties and counsel of record will receive notice of this filing through the Court's CM/ECF system and may access the filing through the Court's CM/ECF system.

s/ Jessi Isenhart
JESSI ISENHART
Senior Trial Attorney